IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CREIGHTON PROPERTY HOLDINGS, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 21-280 |
| | ) |
| NAUTILUS INSURANCE COMPANY, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION**

The above-captioned matter involves a claim for breach of contract arising from an insurance coverage dispute brought by Plaintiff Creighton Property Holdings, LLC ("Creighton") against Defendant Nautilus Insurance Company ("Nautilus"). Presently before the Court is Nautilus' Motion to Dismiss the Complaint of Creighton pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and brief in support (Docket No. 9), the brief in opposition filed by Creighton (Docket No. 11), and Nautilus' reply (Docket No. 12). On July 13, 2023, the Court held oral argument on Nautilus' motion. (Docket No. 17).

For the reasons set forth herein, Nautilus' motion is granted.

**I.     BACKGROUND**

As the parties are well-acquainted with the factual background of this case, at this juncture the Court will present an abbreviated version of the facts, as alleged in the Complaint[1] and in the light most favorable to Creighton, that are relevant to the motion presently before the Court. In

---

[1] Plaintiff Creighton is a limited liability company organized under the laws of the Commonwealth of Pennsylvania with a principal place of business in Kittanning, Pennsylvania, and Defendant Nautilus is a corporation organized under the laws of the State of Arizona that has a principal place of business in Scottsdale, Arizona. (Docket No. 1, ¶¶ 17, 20). Because there is diversity of citizenship between the parties, and since the matter in controversy is in excess of $75,000, this Court has subject matter over Creighton's claim pursuant to 28 U.S.C. § 1332. (*Id.* ¶ 21).

2019, Creighton purchased the former PPG Glass Works property located in Creighton, Pennsylvania (the "Property"), and later decided to redevelop it into the future home and brewery of Pittsburgh Brewing Company. (Docket No. 1, ¶¶ 1, 23). The Property required significant demolition, deconstruction, removal, and refurbishment to prepare it for redevelopment. (*Id.* ¶ 24). Creighton therefore contracted with Lewis Brothers, an industrial contractor that holds itself out as specializing in the demolition, deconstruction, removal, and disposal of industrial buildings, to perform such services at the Property (the "Services"). (*Id.* ¶ 3). Lewis Brothers assured Creighton that it could complete the Services in a timely and workmanlike fashion. (*Id.* ¶ 4).

To that end, as alleged, on February 17, 2020, Creighton entered into a Disposal Services Agreement with Lewis Brothers, under which Lewis Brothers agreed "'to perform [the] removal and disposal services at the [Property] in accordance with generally accepted demolition and disposal practices and procedures in the industry.'" (Docket No. 1, ¶¶ 25, 26 (quoting Docket No. 1-2 at 2)). In so doing, Lewis Brothers was required to perform the Services of deconstructing and removing certain buildings and materials, while preserving others. (*Id.* ¶ 6). Specifically, the Disposal Services Agreement provided that Lewis Brothers would "'[d]econstruct, remove and dispose of the two (2) autoclaves and such other production equipment associated with the former glass production operations from the undamaged buildings as is marked by [Creighton] in advance of [Lewis Brothers] commencing the Services,'" and that "'[n]o equipment or materials that are 1) related to the boiler system, 2) related to the electrical system, 3) related to the air compressors or the compressed air system, or 4) not marked for removal by [Creighton] may be removed from the undamaged buildings.'" (*Id.* ¶ 30 (quoting Docket No. 1-2 at 9)). Lewis Brothers was also to coordinate removal of materials "'*as to not disturb the electrical*, gas, water, sewer, and other

utility lines presently in place at the [Property.]'" (*Id.* ¶ 31 (quoting Docket No. 1-2 at 9) (emphasis added in Complaint)).

As further alleged in the Complaint, under the terms of the Disposal Services Agreement, Lewis Brothers was required to obtain General Liability Insurance and to name Creighton as an additional insured on that insurance policy. (Docket No. 1, ¶ 7). Lewis Brothers therefore secured such an insurance policy through Defendant Nautilus (the "Nautilus Policy" or "Policy"), and notified Nautilus that Creighton should be added as an insured to the Policy. (Docket Nos. 1, ¶¶ 8, 10; 1-3). Accordingly, Creighton, via several Policy endorsements, is identified as an "Additional Insured Organization" on the Policy, which covered property damage caused by the acts or omissions of Lewis Brothers in performing the Services for Creighton. (Docket No. 1, ¶ 10).

According to the Complaint, in performing the Services, Lewis Brothers caused significant and extensive damage and loss (amounting to over a half million dollars) at the Property during the policy period, by removing and damaging electrical equipment in areas of the Property that were plainly outside the scope of the Services. (Docket No. 1, ¶ 11). Creighton, as an additional insured under the Policy, filed a claim with Nautilus to be made whole for the damages caused by Lewis Brothers, but Nautilus did not pay Creighton's claim. (*Id.* ¶¶ 12-14). On February 26, 2021, Creighton filed two lawsuits in this District Court – one against Lewis Brothers (Civil Action No. 21-279) and the present action against Nautilus – seeking, in both actions, compensation for the damages caused by Lewis Brothers. Creighton's suit against Lewis Brothers has since been resolved by the parties. (Civil Action No. 21-279, Docket Nos. 29-32).

The Complaint in this matter against Nautilus alleges one Count for breach of contract. (Docket No. 1 at 9-10). In essence, Creighton contends that, under the terms of the Nautilus Policy, Nautilus is required to compensate Creighton for property damage caused by Lewis Brothers in

the performance of Lewis Brothers' operations for Creighton, and that by not compensating Creighton, Nautilus has breached its obligation to do so under the Policy. (*Id.*). Nautilus filed its motion to dismiss Creighton's Complaint for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The motion has been fully briefed, oral argument has been held (Oral Argument regarding Nautilus' Motion to Dismiss, held on July 13, 2023 ("Oral Argument")),[2] and the motion is ripe for decision.

## II.    STANDARD OF REVIEW

In considering a Rule 12(b)(6) motion to dismiss, the factual allegations contained in the complaint must be accepted as true and must be construed in the light most favorable to the plaintiff, and the court must "'determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)); *see Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 563 n.8 (2007). While Federal Rule of Civil Procedure 8(a)(2) requires only "'a short and plain statement of the claim showing that the pleader is entitled to relief,'" the complaint must "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Phillips*, 515 F.3d at 231 (quoting *Twombly*, 550 U.S. at 555). Moreover, while this standard "does not require 'detailed factual allegations,'" Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555).

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). The Supreme Court has noted that a "claim has facial plausibility when the

---

[2]    An official transcript of the hearing during which oral argument was held has not been produced as of this date. Therefore, the Court discusses the testimony presented by reference to an unofficial draft of the transcript.

4

plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The standard "'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element." *Phillips*, 515 F.3d at 234 (quoting *Twombly*, 550 U.S. at 556). Moreover, the requirement that a court accept as true all factual allegations does not extend to legal conclusions; thus, a court is "'not bound to accept as true a legal conclusion couched as a factual allegation.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

To review a complaint under this standard, the Court proceeds in three steps. *See Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016). First, the Court notes the elements of a claim. *See id.* (quoting *Iqbal*, 556 U.S. at 675). Second, the Court eliminates conclusory allegations. *See id.* (quoting *Iqbal*, 556 U.S. at 679). Finally, the Court assumes the well-pleaded facts that are left are true and assesses "'whether they plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). Also, in reviewing a motion to dismiss, "a court may, in addition to the contents of the complaint, consider any attached exhibits and evidence beyond the complaint including public records . . . , documents essential to [plaintiff's] claim which are attached to defendant's motion, and items appearing in the record of the case." *Smith v. Lincoln Ben. Life Co.*, Civ. Action No. 08-01324, 2009 WL 789900, at *5 (W.D. Pa. Mar. 23, 2009) (internal citation and quotation marks omitted), *aff'd*, 395 F. App'x 821 (3d Cir. 2010).

Additionally, in the courts' consideration of whether claims – if they are to be dismissed – will be dismissed with prejudice, Federal Rule of Civil Procedure 15(a)(2) directs that leave to amend should be freely given "when justice so requires." Denial of leave to amend may be appropriate where there is "'undue delay, bad faith, dilatory motive, prejudice, and futility.'"

5

*Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000) (quoting *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997)).

**III.     LEGAL ANALYSIS**

A plaintiff can establish a claim for breach of contract by showing: (1) the existence of a contract, including its essential terms; (2) a breach of that contract; and (3) resulting damages.  *See Kelly v. Peerstar LLC*, Case No. 3:18-cv-126, 2020 WL 5077940, at *15 (W.D. Pa. Aug. 26, 2020) (citing *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016)).[3]  Here, the parties do not dispute the existence of a valid contract, namely the Policy issued by Nautilus to Lewis Brothers under which Creighton is identified as an additional insured in several of the Policy's endorsements.  (Docket Nos. 1, ¶¶ 8, 10; 1-3 at 65, 68; 9 at 8).  However, the parties disagree as to the meaning of the Policy's terms and, in turn, as to whether Nautilus breached those terms by refusing to pay Creighton's claim.

Creighton contends that, under the terms of the Policy – specifically, under the first endorsement listing Creighton as an additional insured – Nautilus was providing Creighton with first-party coverage and is therefore required to compensate it for property damage caused by Lewis Brothers in performing the Services at the Property.  (Docket No. 1).  Creighton asserts further that, because Nautilus has failed to fulfill its obligation under the Policy to pay Creighton's claim, Nautilus has breached that contract and is liable to Creighton for compensatory damages suffered due to that breach, costs incurred in prosecuting this action (as well as Creighton's direct

---

[3]     In briefing, the parties initially disagree as to which state's law applies to this dispute.  Nautilus argues that Virginia law applies, while Creighton asserts that Pennsylvania law applies.  (Docket Nos. 9 at 17-18, 11 at 15-16).  As the parties have suggested, the Court finds it unnecessary to undertake a choice of law analysis at this juncture because neither party argues that the result would change the outcome here since the relevant law of both states does not differ.  (Oral Argument, *supra*, at 4 n.2; Docket No. 12 at 7 n.2).  The Court further notes, with regard to choice of law, that although Nautilus initially cites some Virginia law (as well as some New York law), both parties primarily discuss cases from Pennsylvania state courts and cases from Federal District Courts in Pennsylvania as well as the Third Circuit Court of Appeals in advancing their respective arguments regarding Nautilus' motion to dismiss.  For the sake of consistency, the Court will apply Pennsylvania law in its analysis of the Insurance Policy here.

action against Lewis Brothers), including attorney fees and costs, pre-judgment interest, and post-judgment interest. (*Id.* at 10). In its motion to dismiss, Nautilus argues that the Policy – which includes the endorsements naming Creighton as an additional insured – does not provide the type of first-party insurance benefits that Creighton seeks in connection with the property damage allegedly caused by Lewis Brothers, so Nautilus did not breach the Policy by failing to pay Creighton's claim. Therefore, Nautilus argues, Creighton's Complaint alleging breach of contract should be dismissed for failure to state a claim upon which relief can be granted.

 **A. <u>Interpretation of Insurance Policies Generally</u>**

The interpretation of an insurance policy is a question of law. *See 401 Fourth St., Inc. v. Investors Ins. Grp.*, 879 A.2d 166, 170 (Pa. 2005). The primary goal in interpreting an insurance policy is to ascertain the intentions of the parties as manifested in the policy's terms. *See id.* at 171. Under Pennsylvania law, an insurance contract is construed according to its plain meaning when the document is read in its entirety. *See Frog, Switch & Mfg. Co., Inc. v. Travelers Ins. Co.*, 193 F.3d 742, 746 (3d Cir. 1999). "Words of common usage in an insurance policy are to be construed in their natural, plain, and ordinary sense," and courts "may inform [their] understanding of these terms by considering their dictionary definitions." *Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 108 (Pa. 1999). "The court should not consider individual terms unmoored from their context but should instead consider the entire contractual provision to determine the intent of the parties." *NorFab Corp. v. Travelers Indem. Co.*, 555 F. Supp. 2d 505, 509 (E.D. Pa. 2008) (citing *401 Fourth St., Inc.*, 879 A.2d at 171); *NVR, Inc. v. Motorists Mut. Ins. Co.*, 371 F. Supp. 3d 233, 242 (W.D. Pa. 2019).

If policy language is unambiguous, the express terms of the policy are controlling. *See Quincy Mut. Fire Ins. Co. v. Imperium Ins. Co.*, 636 F. App'x 602, 605 n.10 (3d Cir. 2016) (citing

7

*Madison Constr. Co.*, 735 A.2d at 106). Any ambiguous policy term is construed against the insurer. *See id.* (citing *Madison Constr. Co.*, 735 A.2d at 106). A policy term is ambiguous if it can reasonably be understood to have more than one meaning. *See id.* (citing *Madison Constr. Co.*, 735 A.2d at 106). A court may not, however, strain or distort the language to find an ambiguity where none exists. *See id.* (citing *Madison Constr. Co.*, 735 A.2d at 106).

### B. The Insurance Policy and the Relevant Endorsements

Upon review of the terms of the Insurance Policy here, the Court notes at the outset that the Policy's initial Declarations page clearly states, "COMMERCIAL PROPERTY COVERAGE PART – NOT COVERED." (Docket No. 1-3 at 3). The Policy then identifies the specific forms and endorsements included as part of the Policy. The first coverage form is entitled "**COMMERCIAL GENERAL LIABILITY COVERAGE FORM**," and provides, in relevant part, as follows:

**SECTION I – COVERAGES**

**COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

1. **Insuring Agreement**

    a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages.

(*Id.* at 6).

As explained, *supra*, the Policy also includes several endorsements which contain Schedules naming Creighton as an additional insured organization. Creighton relies on two endorsements in arguing that Nautilus owes it compensation for Lewis Brothers' actions. The first endorsement, entitled "**ADDITIONAL INSURED – OWNERS, LESSEES OR**

**CONTRACTORS – SCHEDULED PERSON OR ORGANIZATION**," referenced by Creighton in the Complaint, provides in relevant part:

> **A. Section II - Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:
>
> 1. Your acts or omissions; or
>
> 2. The acts or omissions of those acting on your behalf;
>
> in the performance of your ongoing operations for the additional insured(s) at the location(s) designated above.

(*Id.* at 65 (the "first endorsement"); Docket No. 1, ¶¶ 38, 39).

The second endorsement, entitled "**ADDITIONAL INSURED – PRIMARY AND NONCONTRIBUTORY**," referenced by Creighton in its brief and at oral argument, provides in relevant part:

> **A. Section II - Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule of this endorsement, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:
>
> 1. Your acts or omissions; or
>
> 2. The acts or omissions of those acting on your behalf;
>
> in the performance of your ongoing operations, as described in the Schedule of this endorsement, for the additional insured at the location(s) shown in the Schedule of this endorsement, but only for "occurrences" or coverages not otherwise excluded in the Coverage Part to which this endorsement applies.

(*Id.* at 68 (the "second endorsement")).

### C. Whether the Policy Provided Creighton with First-Party Coverage

As explained, *supra*, Creighton alleges in the Complaint that the Nautilus Policy provided it with first-party coverage for property damage caused by Lewis Brothers in performing Services

9

at the Property, and that Nautilus failed to fulfill its obligation to compensate Creighton for such damages.  In moving to dismiss the Complaint, Nautilus contends that Creighton has failed to state a plausible claim because the plain language of the Policy indicates that it is a Commercial Liability Policy that never provided first-party insurance benefits to Creighton or to any other entity, but instead provided coverage to Creighton as an additional insured with respect to Creighton's liability to third parties for damage caused by Lewis Brothers at the Property.[4]  In opposing Nautilus' motion, Creighton makes three arguments:  (1) the fact that the first endorsement does not expressly incorporate the Policy's "owned property" exclusion indicates that such endorsement was intended to provide first-party coverage to Creighton; (2) the plain, ordinary meaning of the word "liability," as used in the endorsements, indicates that the first endorsement was intended to provide Creighton with first-party coverage; and (3) considering the surrounding context of the entire transaction and Creighton's resulting reasonable expectations regarding the Policy, and construing the Policy against Nautilus as the Court is required to do, Creighton has adequately stated a claim as to its entitlement to first-party coverage.

### 1. The "Owned Property" Exclusion and First-Party Coverage

First, Creighton argues that the language of the first endorsement indicates that it was intended to provide Creighton with first-party coverage because that endorsement does not incorporate the Policy's "owned property" exclusion, unlike the second endorsement which does incorporate such exclusion.  More specifically, Creighton notes that both the first and second endorsements amend the main body of the Policy to include Creighton as an additional insured with respect to "liability for" among other things, "property damage" Lewis Brothers caused to

---

[4] In general, the "primary aim of third-party insurance is to defend and indemnify insureds against liability for claims made against them as a result of their own conduct.  First-party coverage, on the other hand, protects against loss caused by injury to the insured's own property." *Port Auth. of New York & New Jersey v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2002).

the Property. (Docket No. 1-3 at 65, 68). However, Creighton further asserts that, unlike the first endorsement, the second endorsement includes language indicating that it amends the Policy, "but only for 'occurrences' or coverages not otherwise excluded in the Coverage Part to which this endorsement applies." (*Id.* at 68). Creighton notes that one of the "occurrences" or "coverages" excluded in the main body of the Policy is the "owned property" exclusion that bars coverage for damage to Property "you own," "on which you or any contractors or subcontractors . . . are performing operations," or "that must be restored, repaired or replaced because 'your work' was incorrectly performed on it." (*Id.* at 9-10). According to Creighton, the difference in language between the two endorsements (*i.e.*, the fact that the first endorsement does not include the additional language) shows that the parties intended thereby to provide Creighton with: (1) first-party coverage for Lewis Brothers' damage to the Property in the first endorsement (pursuant to Lewis Brothers' obligation to indemnify Creighton for "losses" in the Disposal Services Agreement); and (2) third-party coverage for Lewis Brothers' performance of the Services in the second endorsement (pursuant to Lewis Brothers' obligation to obtain the Policy and name Creighton as an additional insured). (Docket No. 11 at 23).

In response, Nautilus explains, first, that the plain language of both the first and second endorsements simply makes Creighton an "insured" under the Nautilus Policy, thus rendering Creighton entitled to coverage under the Policy. Second, Nautilus contends that the "owned property" exclusion (and any other exclusions in the Policy) apply to Creighton under the plain language of *both* endorsements. The endorsements state that they amend "**Section II -Who Is An Insured**" to include Creighton as an "additional insured" under the Policy and, according to Nautilus, the endorsements delineate the specific circumstances under which Creighton will and will not be provided coverage thereunder. Moreover, Nautilus explains, the endorsements do not

11

replace coverage or exclusions to the Commercial General Liability Coverage Form, as is clearly indicated by the plain language of Section B of both endorsements, which states that the endorsements are including "additional exclusions" that apply to Creighton.  (Docket No. 1-3 at 65, 68).

Specifically, the first and second endorsements both provide in plain language, "With respect to the insurance afforded to [Creighton], the following **additional exclusions** apply . . . ." (*Id.* (emphasis added)).  Construing the meaning of this language in its natural, plain, ordinary sense, it is clearly apparent to the Court that the "additional exclusions" listed in the endorsements are to apply to Creighton *in addition to* the exclusions already listed in the Policy.  The exclusions listed in the Policy include the "owned property" exclusion, so that exclusion applies to Creighton under the terms of both the first and second endorsements.  Therefore, the Court disagrees with Creighton's argument that the "owned property" exclusion does not apply to it under the first endorsement, and the Court finds that the plain meaning of the cited language in the first and second endorsements does not indicate that the first endorsement was intended to provide Creighton with first-party coverage for Lewis Brothers' damage to the Property.[5]

---

[5]  Creighton asserts, as an aside, that the parties' intentions must have been different as to the first and second endorsements or there would be no reason to have both endorsements.  Notably, the language of the first endorsement, entitled "**ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – SCHEDULED PERSON OR ORGANIZATION**," provides coverage to Creighton for liability for property damage or personal injury, caused in whole or in part by the named insured's ongoing operations (which Nautilus asserts is distinguished from the named insured's completed operations).  (Docket No. 1-3 at 65; Oral Argument, *supra*, at 4 n.2).  Whereas, the language of the second endorsement, entitled "**ADDITIONAL INSURED – PRIMARY AND NONCONTRIBUTORY**," indicates that to the extent Creighton is insured under the Nautilus Policy, that Policy will be primary and noncontributory (which Nautilus explains is important because, in the absence of such endorsement, there would be a question as to which carrier pays if Creighton also had its own policy).  (Docket No. 1-3 at 68; Oral Argument, *supra*, at 4 n.2).  Nautilus emphasizes that the two endorsements contain various differences in language, and agrees that the two endorsements do, in fact, serve different purposes – just not the purpose of providing first-party coverage that Creighton proposes.  The Court agrees that there are a number of differences in the language of the two endorsements, which indicates that they are not merely redundant, but does not necessarily show that the first endorsement was intended to provide Creighton with first-party coverage.

## 2. The Plain Meaning of "Liability"

Second, Creighton argues that the word "liability" is used in the endorsements but not in the Policy, that the endorsements' language trumps the Policy language, and that the use of the word "liability" was intended to provide Creighton with coverage for damage to the Property that Lewis Brothers caused while performing the Services. (Docket No. 11 at 20-23). Specifically, Creighton notes that the Policy provides that Lewis Brothers was insured against sums it became "legally obligated to pay as damages" because of (among other things) property damage, whereas the endorsements state that the Policy is amended to include [Creighton] as an additional insured, "but only with respect to *liability* for," among other things, property damage. (Docket No. 1-3 at 6, 65, 68 (emphasis added)). Creighton argues that, because the word "liability" in the endorsements is not defined, the Court should consult a dictionary to determine the word's plain and ordinary meaning. In sum, Creighton contends that the plain meaning of the word "liability" differs from the meaning of the phrase "legally obligated to pay as damages," such that the use of the word "liability" (in the first endorsement, specifically) was intended to provide Creighton with first-party coverage. (Docket No. 11 at 22).

Instead of offering a straightforward dictionary definition of the word "liability," however, Creighton provides the Court with a somewhat convoluted definition of the word that obscures its plain and ordinary meaning. Specifically, Creighton cites to a Bankruptcy Court case that applied a definition of the word "liability" – which was appropriate under the circumstances of that particular case but is not necessarily appropriate here – as "[a]n attribute or trait which sets one at a disadvantage; hence, a burdensome or disadvantageous person or thing, a handicap." (Docket No. 11 at 22 (quoting *In re Pittsburgh Corning Corp.*, 417 B.R. 289, 310 (Bankr. W.D. Pa. 2006))). Creighton extrapolates from this definition of the word "liability" that "the damage Lewis Brothers

13

caused to the Property was '[a]n attribute' and 'trait which set[] Creighton at a disadvantage' and was 'a burdensome' and 'disadvantageous' 'thing' and 'a handicap.'" (*Id.*). Creighton then argues that, based on its proffered definition of the word "liability," the plain language of the first endorsement was intended to provide Creighton with first-party coverage for damage to the Property that Lewis Brothers caused while performing the Services. (*See id.*).

In contrast, Nautilus argues that, first and foremost, the word "liability" is not a confusing word subject to multiple understandings such that a dictionary definition must be relied upon, but that the word is instead simply understood to mean "owing or potentially owing something to a third party." (Docket No. 12 at 11). Nautilus notes that this plain, natural meaning of the word is especially appropriate in the context of the Policy at issue here, "a 'Commercial General Liability Policy' that expressly states that 'Commercial Property Coverage' (*i.e.*, first party insurance benefits for property coverage) is '**NOT COVERED**.'" (*Id.* at 11-12 (quoting Docket No. 1-3 at 3)).

Nautilus further asserts that, even if the Court were to consult a dictionary to assist it in discerning the word's plain and ordinary meaning, the word "liability" is generally understood to mean:

- The quality or state of being liable. "Liability." *Merriam-Webster.com Dictionary*, Merriam-Webster 2021, https://www.merriamwebster.com/dictionary/liability. Accessed 1 Jun. 2021.

- Moneys owed; debts or pecuniary obligations. "Liability." *Dictionary.com Unabridged*, Random House Unabridged Dictionary 2021, https://www.dictionary.com/browse/liability. Accessed 1 Jun. 2021.

- The fact that someone is legally responsible for something. "Liability." *Dictionary.Cambridge.Org*, Cambridge Business English Dictionary 2021, https://dictionary.cambridge.org/us/dictionary/english/liability. Accessed 1 Jun. 2021.

14

- The state of being legally responsible for something. "Liability." *OxfordLearnersDictionaries.com*, Oxford Advanced Learner's Dictionary, 2021, https://www.oxfordlearnersdictionaries.com/us/definition/english/liability. Accessed 1 Jun. 2021.

- The quality, state, or condition of being legally obligated or accountable; legal responsibility to another or to society; enforceable by civil remedy or criminal punishment. *Liability*, Black's Law Dictionary (11th ed. 2019). . . .

- The condition of being liable or answerable by law or equity. "Liability." *OED.com*, Oxford English Dictionary 2021, https://www.oed.com/definition/liability.

(Docket No. 12 at 12).

Nautilus further notes that the more obscure definition of the word "liability" that Creighton plucked from *In re Pittsburgh Corning Corp.*, when considered in the context of that case, is still understood as referring to something *owed to a third party*, so such definition also fails to support the argument that the use of that word was intended to provide Creighton with first-party coverage under the Policy. (*See id.* at 13 (quoting *In re Pittsburgh Corning Corp.*, 417 B.R. at 293, and noting that throughout that opinion, the court discusses the liability of Pittsburgh Corning Corp. and each time is referring to liability to third parties/claimants)).

In light of the Court's understanding of the word "liability" in its natural, plain, ordinary sense, and considering the context in which the word is used within the first endorsement and the Policy as a whole, the Court finds that the only reasonable interpretation of the word "liability" comports with the numerous dictionary definitions supplied by Nautilus, indicating *being liable to a third party*. In contrast, the Court finds that Creighton's proffered definition of the term – which, as Creighton has applied it here, the Court finds to be a deconstruction of the word and a reconstruction of the word in a contorted fashion – does not comport with the word's plain

meaning. Moreover, the Court finds that the term as used in the first endorsement is simply not susceptible to more than one construction and is not ambiguous. As such, the use of the word "liability" in the first endorsement is consistent with a policy providing third-party coverage. Accordingly, the Court finds that the use of the term "liability" in the first endorsement to the Policy does not indicate that such endorsement was intended to provide Creighton with first-party coverage.

### 3. The Surrounding Context of the Policy

Lastly, Creighton urges the Court, in ascertaining whether the parties intended the Policy to provide first-party coverage, to consider the surrounding context of the transaction in which Lewis Brothers was, according to Creighton, required to bear all the risk of performing the Services under the Disposal Services Agreement. However, the Court notes that, because it does not find the terms of the Policy or its endorsements to be ambiguous (as explained, *supra*), the Court need not consider parol evidence to understand the meaning of those terms. *See Thomas Rigging & Constr. Co., Inc. v. Contraves, Inc.*, 798 A.2d 753, 755-56 (Pa. Super. Ct. 2002). Furthermore, because the language of the Policy and the endorsements is not ambiguous, the express terms of those documents are controlling, and such language is not composed of ambiguous terms that the Court must construe against Nautilus as the insurer. *See Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999); *Reliance Ins. Co. v. Moessner*, 121 F.3d 895, 905 (3d Cir. 1997) (noting that "courts have attempted to favor the insured in a number of ways, including by adapting the *contra proferentem* principle of interpretation to the insurance context, by which ambiguities in policies are construed against the insurer").

However, even assuming, *arguendo*, that the Court had found the Policy's terms to be ambiguous, thus rendering it necessary to delve into the surrounding context of the Policy to

discern the parties' intentions, Creighton does not allege facts showing that it had a reasonable expectation that the Policy would provide first-party coverage. The Disposal Services Agreement required Lewis Brothers to obtain "General Liability Insurance" and to "name [Creighton] as an additional insured," which, the parties agree, is precisely what was done. (Docket No. 1-2 at 5). Additionally, as Nautilus' counsel noted during oral argument, the plain language of the Disposal Services Agreement, which clearly set forth the insurance requirements, specifically included coverage for Workers' Compensation Insurance, Employer's Liability Insurance, General Liability Insurance, Automobile Liability Insurance, and Excess (Umbrella) Liability Insurance, but not for first-party property coverage. (Oral Argument, *supra*, at 4 n.2; Docket No. 1-2 at 5). Moreover, as Nautilus notes, the cases Creighton cites in relation to this argument pertain to situations where an additional insured was entitled to coverage for its liability *to a third party* (or are otherwise irrelevant). (Docket No. 11 at 15 n.8 (citing cases including *Mut. Benefit Ins. Co. v. Politopoulos*, 115 A.3d 844 (Pa. 2015), and *Ramara, Inc. v. Westfield Ins. Co.*, 298 F.R.D. 219 (E.D. Pa. 2014))). Therefore, the Court notes that – even if it had found the language of the Policy to be ambiguous, which it has not – Creighton has not alleged additional facts from which the Court could infer that Creighton had a reasonable expectation, based on the surrounding context of the transaction, that the Policy would provide it with first-party coverage.

### D. Dismissal With Prejudice

Nautilus argues that the Court should dismiss Creighton's claim for breach of contract with prejudice because amendment of the Complaint would be futile. (Docket No. 9 at 24). Nautilus states that "Creighton cannot avoid with artful pleading the fact that its Complaint does not contain allegations sufficient to trigger the Policy's additional insured coverage." (*Id.*). Nautilus further argues that "[n]o tortured interpretation of the Policy or the word 'liability' can convert" the Policy

here, a commercial general liability policy, into a policy providing first-party coverage. (Docket No. 12 at 16). Upon consideration, the Court agrees and finds that no amendment to the pleading can change the natural, plain, ordinary meaning of the language used therein. Accordingly, because Creighton will not be able to amend its pleading to state a plausible claim, leave to amend would be futile and Creighton's claim will be dismissed with prejudice. *See Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000) (*quoting In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997)).

### IV. CONCLUSION

For the reasons set forth, Nautilus' motion to dismiss is granted pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Accordingly, Creighton's Complaint is dismissed in its entirety with prejudice.

An appropriate Order follows.

*s/ W. Scott Hardy*
W. Scott Hardy
United States District Judge

Dated: January 4, 2024

cc/ecf: All counsel of record